**UNITED STATES DISTRICT COURT**
**DISTRICT OF RHODE ISLAND**

**UNITED STATES OF AMERICA**

**v.** **Cr. No. 06-00125-01ML**

**IRWIN KALMER**

**DEFENDANT IRWIN KALMER'S SENTENCING MEMORANDUM IN SUPPORT OF MOTION FOR DOWNWARD DEPARTURE AND/OR MOTION FOR SENTENCE VARIANCE PURSUANT TO *UNITED STATES v. BOOKER*, 543 U.S. 220 (2005) AND 18 U.S.C. § 3553(a)**

## I. INTRODUCTION

Defendant Irwin Kalmer ("Mr. Kalmer") respectfully submits this sentencing memorandum and exhibits thereto in support of his motion for downward departure and/or his motion for sentence variance, pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a), in connection with his sentencing on May 11, 2007. On November 2, 2006 Mr. Kalmer entered into a plea agreement and on December 20, 2006 pleaded guilty to a one count Information charging Filing a False Tax Return in 2002, in violation of 26 U.S.C. § 7206(1).

Mr. Kalmer seeks to provide this Court with information pertinent to his sentencing and, pursuant to U.S.S.G. § 5H1.6, respectfully moves the court to exercise its discretion to downwardly depart from the applicable guidelines range Level 13 (12-18 months), to a Level 10,[1] a term of probation with a special condition of six months home confinement, based on extraordinary family circumstances. In addition and alternatively,

[1] All references to the Sentencing Guidelines are to the 2006 edition, in effect at the time of sentencing, because the offense level provided under § 2T4.1, remains the same as the offense level provided under § 2T4.1 at the time Mr. Kalmer committed his most recent offense in 2002. *See United States v. Roselli*, 366 F.3d 58, 61 n. 2 (1st Cir. 2004). Similarly, the fines for the offense level provided under § 5E1.2 in the 2006 edition remain the same as those in the 2002 edition.

apart from the guidelines, Mr. Kalmer moves for sentence variance pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a), as it is respectfully submitted that extraordinary family circumstances are relevant to and support the requested sentence pursuant to the statutory factors under 18 U.S.C. § 3553(a).

As set forth more fully below and in the attached submissions, Mr. Kalmer and his wife have two four year old adopted sons from Russia who "would be at risk for significant decompensation and reactivation of their posttraumatic symptoms related to early neglect" as a result of their early experiences in a Russian orphanage if Mr. Kalmer were "removed from his sons' lives for any significant period of time." *See* Letter of Dr. Pamela L. Shuman, Child Psychiatrist and Clinical Assistant Professor of Psychiatry, Brown University School of Medicine, February 25, 2007, p.5 and Dr. Shuman's Curriculum Vitae at **Tab A**. ("Dr. Shuman Let.").

Moreover, Mr. Kalmer's involvement in activity to which he pled guilty is in sharp contrast with the otherwise law-abiding and responsible life he has led, filled with charitable works.

## II. BACKGROUND

### A. Professional and Family Life

As the Presentence Report ("PSR") sets forth a detailed summary of Mr. Kalmer's background, it will not be repeated here in its entirety. However, certain aspects of his life will be highlighted as they show his dedication to his family, friends, his community and business acquaintances and his wonderful personal qualities. Mr. Kalmer was born in New York City , September 16, 1946 and was raised by his father who was a shoe store owner in Stamford, Connecticut, and his mother, a homemaker. The family lived in

Stamford, Connecticut where Mr. Kalmer spent his entire childhood before attending college in Boston, Massachusetts and Columbus, Ohio and Providence, Rhode Island. Mr. Kalmer has resided primarily in Rhode Island for the past thirty eight years. He holds a B.S. in Business Administration from Bryant College, Providence, Rhode Island (1970), a Masters Degree in Business Administration from Suffolk University, Boston, Massachusetts (1971), and another B.S. in Business Administration from Bryant College in Smithfield, Rhode Island (1979). He was licensed as a Certified Public Accountant in Rhode Island on November 5, 1986. He also holds a Certificate in Advanced Graduate Studies in Accounting from the Bryant College Graduate School (1991) and a Master of Science Degree in Taxation from Bryant College, Smithfield, Rhode Island (1998).

In 1996, Mr. Kalmer married Diane (Peterson) Kalmer to whom he has been married for the past ten years.[2] After several heartbreaking miscarriages, in September and October of 2003, Irwin and Diane traveled to Russia on initial visits to adopt their two sons, Samuel Rustam Kalmer ("Sammy") and Gary Alexander Kalmer ("Sasha"),who were ten and eight months old, and had been living in a Russian orphanage since birth.[3] They are now four years old.

Mr. Kalmer has led a very stable life, at the center of which is his family, work and the community he has lived in for many years. As the many letters to the court

[2] Mr. Kalmer's two prior marriages ended in divorce, one after seven years and one after three years. *See* PSR at p.6. He has one daughter by his first marriage, Alexis Lamont, age 31 with whom he has a strained relationship. When Alexis was ten years old, her mother, wearying of caring for her daughter, asked the defendant to take her and she lived with him for seven years. When Alexis was 17 years old she began seeing a young man who was incarcerated at the Adult Correctional Institution. Mr. Kalmer forbad his daughter from continuing the relationship, finally gave her an ultimatum, and she to chose return to her mother. In 1990, he also took in his niece (his brother's daughter) who had been arrested in Pennsylvania, to live with him and Alexis for a year before his niece returned to live with her mother.

[3]They were finally adopted October 28, 2003.

written by business colleagues and family members attest, *see* letters collected at **Tab B**, Mr. Kalmer is a man whose family, clients and many others rely upon, and he has unfailingly responded with kindness, guidance and, in many instances, substantial charitable work for those in need. As one person put it, Mr. Kalmer has shown himself over and over again through the years to be a loving, caring and devoted husband, parent, son and friend.[4] Mr. Kalmer's personal behavior is all the more remarkable not only because of its consistency over many years, but also because of the serious family situation and responsibility arising out of his sons' behavioral problems, which has been a constant part of both his and Diane's life since they adopted the boys.

Their adoption is, in fact, just one example of his goodness and completely unselfish nature. He and his wife have provided a loving and stable environment for the boys, no doubt in stark contrast to their life had they been left to grow up in a Russian orphanage. Furthermore, many of his family members and friends have described in the letters submitted herewith, the caring and dependable man Mr. Kalmer is and has been for these many years. *See* letters collected at Tab B, *in passim*. The letters also describe Mr. Kalmer's incredible work ethic, his charitable services, and his long career working tirelessly for his clients as a Certified Public Accountant.[5]

Finally, many people describe his readiness to help not only his immediate family, but also friends, co-workers and strangers. For example, in 1988 he began working with Reverend Edward J. Marino, when no other area accountant would help, to spearhead the

---

[4] *See* Tab B, Letters of Diane Kalmer and David Peterson.

[5] *See* Tab B, *e.g.*, Letters of Robert Goodwin, Robert McLintock, James and Mayliko Carter, Kurt Klopfstein, Peter Micheli, Robert Bernstein, Mario and Mary Ann Faria, Jamie Nero, Stephen Palmisciano, Francis Stevens, Judy Stavropoulos, Fernand and Lorraine Phaneuf, Donna Copeland, George J. Allen, Linda Colangelo, Bonnie England, Richard V. DiGennaro, Anthony Simeone, Jr. and Rhue R. Reis.

revival of the Scalabrini Villa Nursing Home which was in "severe disrepair … mostly due to poor management" and "financially in total disarray" into an efficient and financially stable nursing home facility.[6] Mr. Kalmer did so by spending countless hours over twelve years, often unpaid, to assist in not only the first financial phase, but also through the second phase of the building of a new facility, until the ribbon cutting ceremony of the new 120 bed nursing facility. *Id*. at 1-2. As Rev. Marino said in describing Mr. Kalmer's 18 year commitment to the revitalization project, "it was truly an act of selflessness and love. … [Mr. Kalmer has] many qualities that you do not find in many people today." *Id*. at 3. Nor did his charity stop there -- he also provided *pro bono* assistance for many of the employees of the nursing home with financial problems who needed help and who Reverend Marino sent to him. *Id*. at 3. ("Irwin had no obligation to assist our employees except that his heart demanded it." *Id*.). His work for the nursing home and its employees is emblematic of his numerous charitable deeds and of the many *pro bono* hours he has spent helping those with financial difficulty and others who simply needed a helping hand.[7] Mr. Robert McLintock describes Mr. Kalmer as one of the most compassionate people he has ever known, describing how he helped him through a family crisis by overseeing his business.[8] Such outpouring of support and

---

[6] *See* Tab B, Letter of Reverend Edward Marino, Administrator of the Salabrini Villa; Letter of Attorney John J. Kupa, Jr. ("I recall Irwin working tirelessly on the project, almost as though it was his life's work. …[H]e gave of his time freely. I know for a fact that he donated many of his hours.") Attorney Kupa also emphasized the numerous clients Mr. Kalmer has assisted who were not able to pay.

[7] *See* Tab B, Letter of Diane Larsh (Mr. Kalmer has prepared tax returns free of charge because of her financial struggles); Letter of Rita Cesario (Mr. Kalmer has donated his services to her organization which teaches children ages 14-20 who are interested in law enforcement careers).

[8] *See* Tab B, Letters of Robert McLintock and Stacey Carlton.

affection for Mr. Kalmer demonstrates he has led a life filled with compassion and purpose to help those in need, often expecting and receiving no compensation in return.

**B. The Psychological Condition of Mr. Kalmer's Two Sons**

Dr. Pamela L. Shuman has set forth the conditions in which Sasha and Sammy Kalmer live their daily lives. *See* Dr. Shuman Let. at Tab A. Dr. Shuman is a psychiatrist and Clinical Assistant Professor of Psychiatry at Brown University School of Medicine.

Dr. Shuman finds that the boys' experience in the Russian orphanage has damaged them, physically and psychologically and that the presence of Mr. Kalmer is essential to their continued recovery and emotional growth. *Id.* Dr. Shuman notes that children adopted from Russian orphanages, "have an elevated risk of attachment[9] and post-traumatic stress disorder[10] due to lack of a consistent and nurturing primary care giver." *See* Dr. Shuman Let. at p. 2. Both boys, who were 8 and 10 months old when they were adopted, exhibited psychological trauma manifested in a number of ways from

---

[9] The essential feature of Separation Anxiety Disorder is "excessive anxiety concerning separation from the home or from those to whom the person is attached. … An additional criterion is that the disturbance "cause clinically significant distress or impairment in social academic or other important areas of functioning". *Diagnostic and Statistical Manual of Mental Disorders*, 4th Edition, § 309.21, p.121-22 ("DSM-IV"). "When separated from major attachment figures, these individuals are often preoccupied with fears that accidents or illness will befall the attachment figures or themselves. Children with this disorder often express fear of being lost and never being reunited with their parents. … they may be reluctant or refuse to attend school or camp, to visit or sleep at friends' homes, or to go on errands, … unable to stay or go in a room by themselves." *Id*. The disorder "may develop after some life stress. (*e.g*., the death of a relative … illness of the child …, a change of schools, a move to a new neighborhood, or *immigration*). Typically there are periods of exacerbation and remission." *Id*. at p. 123. (emphasis added).

[10] "The essential feature of Post Traumatic Stress Disorder is the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or threat to one's physical integrity; or witnessing [such an event] … A child's response to the event must involve "disorganized or agitated behavior." *See* DSM IV at § 309.81, p. 463. Symptoms may include recurrent nightmares, hypervigilance and sometimes irritability or outbursts of anger or difficulty concentrating on or completing tasks. *Id*. at 464. "Individuals who have recently emigrated from areas of considerable social unrest and civil conflict may have elevated rates of [the disorder]" *Id*. at 465.

the time when they first lived with the Kalmers, *e.g.*, Sasha sat with his fists clenched in the first months and vomited after every meal, Sammy was physically tiny, would approach anyone without distinction, was in constant motion and not able to focus on anything and was hyperactive and defiant. *Id.* at p.2-3. Sammy is especially attached to Mr. Kalmer and simply refuses to respond to anyone -- including his mother -- other than his father. In fact, Sammy remains hyperactive and his recent early childhood screening showed that his attention deficit and high activity made it impossible to complete many of the developmental screening tasks and showed speech and language delays that will require treatment within a specialized preschool setting. *Id.* at 4. He also still has difficulty responding to anyone other than Mr. Kalmer, and will most likely require treatment for Attention Deficit Hyperactivity Disorder.[11] *Id.* at 3-4. Sasha also remains withdrawn and relies on his brother in social situations before he will join in any activity. *Id.* at 4. While both boys are now 4 years old and beginning to make an adjustment to their new life in Rhode Island, Dr. Shuman has concluded:

> If Irwin were removed from his sons' lives for any significant period of time at this important phase of their development, both boys would be at risk for significant decompensation and reactivation of their posttraumatic symptoms related to early neglect. The reliable nurturing presence of both their parents constitutes the secure foundation on which they achieved all their developmental gains. To remove either parent would undermine that foundation.[12]

*Id.* at 5.

---

[11] *See* Tab A, Dr. Shuman Letter at pp.3-4; *Diagnostic and Statistical Manual of Mental Disorders*, 4th Ed., § 299.80 p. 85.

[12] Because Sammy is especially attached to the defendant and has exhibited some defiant behavior that only his father is able to control, the defendant was concerned that Sammy especially would suffer a significant emotional setback should he be separated from his father for any extended period of time. The defendant and his wife, Diane, wished to understand the problems they might face if the defendant were separated from the boys. To that end, they had the children evaluated by Dr. Pamela Shuman, a Child Psychiatrist.

Similarly, Mr. Kalmer's sister in law, a social worker who has worked with children in foster care for 18 years, notes that she too fears that a prolonged separation from their father will "likely undermine any effective parenting that has been offered them and that "[t]here would likely be behavior issues related to separation anxiety including acting out with anger and aggression and … depression and anxiety." *See* Let. Sherill Keenan-Kalmer, MSW, Tab B.

**C. Mr. Kalmer's Role in the Care of his Mother**

In addition to Mr. Kalmer's central role in the rearing and emotional stability of his two young children, he is presently the sole family caretaker of his 98 year old mother who lives in a residential care facility in Connecticut. *See* Mr. Kalmer's Objections to ¶ 73; *see also* Let. of Howard Kalmer. She suffers from Alzheimer's disease and sometimes does not know her son who visits her on a regular basis. Nonetheless, his visits (along with the children whenever possible) lift her spirits and are important to maintaining her health. *Id.* He confers with the health care personnel both in person and by telephone on issues such as adjusting medication and feeding issues. *Id.* His involvement ensures that his mother is getting the best possible care under the circumstances. He handles the financial aspects of her care as well. *Id.* Mr. Kalmer's only sibling lives in California, travels extensively and simply is not able to visit his mother on a regular basis.

**D. What Led Mr. Kalmer Into Criminal Activity**

In the first instance, it must be emphasized that Mr. Kalmer accepts full responsibility for his conduct and the criminal offenses for which he has been charged. He has submitted a letter setting forth the reasons for committing this crime and the

influences on him of some of the circumstances and events which gave rise to his conduct. *See* Let. from Irwin Kalmer, attached hereto at **Tab C**. In essence, he was taught from childhood that money was always an important way of bringing happiness, solving problems and helping then to feel worthwhile. *Id*. At least since 1999, Mr. Kalmer has experienced a number of painful occurrences, setbacks, and stress including the death of his father in 1996 who was an extremely important figure in his life, and its continuing effect on him the decline in his mother's physical and mental health as she descended into dementia and then Alzheimer's disease and the discovery of his and his wife's inability to have children. *Id*.

**E. Mr. Kalmer's Payment of Federal and State Income Taxes**

On November 7, 2006, Mr. Kalmer made a deposit of income tax with the Internal Revenue Service in the amount of $90,000.00, pursuant to Revenue Procedure 2005-18. On November 8, 2006 he made a deposit of income tax with the State of Rhode Island in the amount of $15,000. *See* Lets. to IRS from J. Groshek, dated November 7 and 8, 2006 attached at **Tab D**.

## III. ARGUMENT

**A. Pursuant to U.S.S.G. § 5H1.6, Mr. Kalmer's Extraordinary Family Circumstances, Which Make Him Irreplaceable To His Family, Warrant a Downward Departure From a Level 13 to a Level 10, A Term of Probation with a Special Condition of Home Confinement.**

It is submitted that Mr. Kalmer's sons continue to suffer from psychological damage due to their traumatic experiences in a Russian orphanage, that Mr. Kalmer's caretaking which involves nearly every aspect of their everyday life, the fact that one child responds only to him and the prognosis that should Mr. Kalmer be removed from the home there is a significant risk that they would decompensate and regress to their

original behaviors makes this case "exceptional" in that Mr. Kalmer is irreplaceable to his family. His sons require the continued full and active participation of Mr. Kalmer as part of a secure and predictable routine in order to provide a solid foundation from which they will be able to maintain and build upon their modest developmental gains. Therefore, a downward departure from a Level 13 (18-24 months) to a Level 10 (probation with home detention) is warranted.

Departures are warranted only where the circumstances, "render the case atypical and take it out of the 'heartland' for which the applicable guideline was designed." *United States v. Roselli*, 366 F.3d 58, 67 (1st Cir. 2004) quoting *United States v. Carrion-Cruz*, 92 F.3d 5, 6 (1st Cir. 1996). While family ties and responsibilities are a "discouraged factor" and are not ordinarily relevant in determining whether a downward departure may be warranted, a departure is permissible if those family circumstances are found to be "exceptional." *See Roselli*, 366 F.3d at 68 ("The sentencing guidelines deem family circumstances a discouraged ground for departure, and a district court may depart on the basis of a discouraged ground only in an 'exceptional' case") quoting *United States v. Louis*, 300 F.3d 78, 81-82 (1st Cir. 2002).

The Commentary to §5H1.6 sets forth general and specific circumstances which the court must consider in determining whether a departure is warranted under this policy. The only relevant general circumstance is "the seriousness of the offense." §5H1.6, Comment 1(A). The specific circumstances which must be taken into consideration by the court where a departure is based on loss of caretaking or financial support of the defendant's family are: (i) whether the "defendant's service of the sentence within the guideline range will cause a substantial direct and specific loss of essential

caretaking or essential financial support to the family"[;] (ii) the "loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant" … [;] (iii) the "loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family"[;] (iv) the "departure will effectively address the loss of caretaking or financial support." *Id*. S*ee also Roselli*, 366 F.3d at 67 (downward departure for extraordinary family circumstances may be appropriate where the care provided by defendant deemed "irreplaceable or otherwise extraordinary; *United States v. Pereira*, 272 F.3d 76, 82 (1st Cir. 2001) (same).

The First Circuit, along with other courts, have upheld departures where a defendant was so irreplaceable that incarceration would cause exceptional hardship to his family "only on rare occasions, noting that 'time consuming family responsibilities, by themselves are not sufficient to take a case out of the 'heartland'", *Roselli*, 366 F.3d at 68. These cases, however clearly include circumstances in which there are severe psychological or physical needs of a child or family member which can only be cared for by the defendant. *Roselli*, 366 F.3d at 67-70[13] (in tax fraud case, three level departure to one year probation under home confinement upheld, where two sons with cystic fibrosis required around the clock care, wife had debilitating health problems, adequate help not readily available and only defendant could provide necessary emotional support and physical care for two sons); *United States v. Rivera*, 994 F.2d 942, 952-54 (1st Cir. 1993) (district court may justifiably depart on remand where defendant was single mother of

[13] In *Roselli,* 366 F.3d at 60 the defendant was convicted of conspiracy to aid and abet the filing of false tax returns, in violation of 26 U.S.C. § 7206(2).

three children, received income only from welfare, and had virtually no contact with or support from other family members; *United States v. Haversat*, 22 F.3d 790, 797 (8th Cir. 1994) (upholding departure and finding exceptional family circumstance where defendant irreplaceable because wife suffered from severe psychiatric disorder and defendant was needed to identify the onset of regression and seek out immediate treatment to avoid a serious situation).[14]

*United States v. Sclamo*, 997 F.2d 970, 974 (1st Cir. 1993),[15] decided pre-*Booker*, is very similar to this case. In *Sclamo*, the First Circuit upheld the district court's reduction of criminal history to a category I and seven level downward departure to three years probation and six months home detention where the twelve year old son of the woman defendant had been living with for three years suffered from a psychiatric disorder, had a long history of disruptive and aggressive behavior, and as set forth in a psychologist's report, had made dramatic progress due to the care and support of the defendant and that the boy's condition would deteriorate if defendant was incarcerated. *Id*. at 972. In addition there as here, the psychologist warned that Sclamo's removal from the family "clinically could trigger a major regression in the boy's stability and emotional development." *Id*. Under these circumstances the Court found:

---

[14] *See also United States v. Lacarubba,* 184 F. Supp.2d 89, 97-98 (D. Mass. 2002) (defendant whose wife of thirty years suffered from terminal liver cancer found irreplaceable as source of emotional and physical support to wife).

The instant case is wholly unlike those which have been found by the First Circuit not to warrant a downward departure because "there are feasible alternatives of care that are relatively comparable to what the defendant provides." *Pereira*, 272 F.3d at 82-83 (departure unwarranted where defendant's obligation was to provide care to elderly parents). *See also*, *United States v. Louis*, 300 F.3d 78 (1st Cir. 2002) (where the defendant's nine year old son suffered from asthma, but with whom defendant did not live); *United States v. Carr*, 932 F.2d 67, 72 (1st Cir. 1991) (departure unwarranted where defendant had four year old child and her husband was also facing imprisonment but defendant's mother able to care for child).

[15] In *Sclamo*, 997 F.2d at 971, the defendant was convicted of possession with intent to distribute cocaine.

> Sclamo's situation readily distinguishable from ordinary cases where one can only speculate abut the stresses that incarceration of a family member might cause, … [T]here is evidence not only that [the boy] already suffers from a clinical disorder, but that his condition will deteriorate if defendant is incarcerated. Sclamo has a track record of steady and effective support and guidance of [the boy] over a lengthy period ... . The psychologist's prognosis that [the boy] would risk regression and harm if the defendant were incarcerated amply supports the district court's determination that Sclamo's relationship to [the boy] is sufficiently extraordinary to sustain a downward departure.

*Sclamo*, 997 F.2d at 974.[16] The same can be said here, along with the facts that Mr. Kalmer is the sole financial support for his family, he is the boys' father, as opposed to a live-in boyfriend as in *Sclamo,* and the boys here are at the "a crucial developmental stage" of four years of age a stage at which "it is especially important … that their security not be disrupted by any loss or change in the accessibility of either parent." *See* Dr. Shuman Let. at 4.

In addition, under the facts and circumstances presented here, it can certainly be said that the defendant's service of 12-18 months incarceration, the sentence within the guideline range, will cause a substantial direct and specific loss of essential caretaking *and* essential financial support to the family which would "exceed the harm ordinarily incident to incarceration for a similarly situated defendant." *See* §5H1.6 Comment B(i). Mrs. Kalmer remains at home full time with the children, and because of their disorders would be unable to work should Mr. Kalmer be incarcerated. *Id.* at Comment B(i) and (ii). As set forth above, Mr. Kalmer's caretaking is that for which there is "no effective remedial or ameliorative programs reasonably are available" because it is Mr. Kalmer

[16] The Court relied on two pre-*Booker* cases from the Second and Tenth Circuit in which the departures were upheld based on family circumstances, one of which was arguably not as serious as the instant case. *See e.g*., *United States v. Johnson*, 964 F.2d 124, 129 (2d Cir. 1992) (affirming departure for defendant who faced more than the responsibilities of an ordinary parent, more than even those of an ordinary single parent as sole caregiver of 4 very young children; *United States v. Pena*, 930 F.2d 1486, 1495 (10th Cir. 1991) (affirming departure to avoid placing infant children at risk.)

and he alone to whom the boys respond, whose presence and participation in the fabric of their everyday routine is essential and whose removal may subject the boys to decompensation -- thereby making him irreplaceable to his family. *Id*. at Comment B(iii). The departure to probation with home confinement "will effectively address the loss of caretaking or financial support" as he will be permitted to go to work and perform the same caretaking function he is performing now. *Id*. at Comment (B)(iv). Finally, while Mr. Kalmer does not minimize the crime for which he is charged, on a continuum of seriousness the crime of filing a false tax return and failure to declare and pay his full taxes for four years, cannot be considered a "serious" crime. *Id*. at Comment (A)(i). Moreover, he has paid in full both his state and federal taxes (not including interest and penalties which have not yet been determined). Thus, both under the pre-*Booker* law in this Circuit and the circumstances this court is required to take into consideration under §5H1.6, this is one of those "rare occasions" where a downward departure based on extraordinary family circumstances is warranted.

*United States v. Spero*, 382 F.3d 803 (8th Cir. 2004)[17] is also illustrative and bears a striking similarity to this case. There the Eighth Circuit, relying on *Sclamo* upheld an eight level downward departure to five years probation, six months home detention of a defendant convicted of bank fraud based on §5H1.6 where one of defendant's four children had been diagnosed with Pervasive Developmental Disorder, mild retardation, Attention Deficit Disorder, obesity and macrocephaly. *Id*. at 804. Both the son's doctor and his mother provided the court with evidence that the defendant's active participation in his son's life and daily routine, which was invaluable to the child's further

---

[17] In *Spero*, 382 F.3d at 803, the defendant was convicted of bank fraud, in violation of 18 U.S.C. §1344.

development, made the father irreplaceable. *Id.* at 805. The Court found that "[w]hen one parent is critical to a child's well being, as in this case, that qualifies as an exceptional circumstance justifying a downward departure." *Id. See also Louis*, 300 F.3d at 82 (the test is not value of particular support defendant gives child, but rather whether, "that support is so different in kind or degree from the many kinds of support that can be important in the parent/child relationship that it makes the family ties and responsibilities factor exceptional.").

Here, Dr. Shuman's prognosis that if Mr. Kalmer "were removed from his sons' lives for any significant period of time at this important phase in their development, both boys would be at risk for significant decompensation and reactivation of their posttraumatic symptoms", certainly demonstrates that Mr. Kalmer is critical to their well being. *See* Letter of Dr. Shuman at 4. Sammy in particular relies on his father as a bedrock source of comfort and safety as shown by his lack of responsiveness to his own mother. Indeed Dr. Shuman has concluded that the absence of Mr. Kalmer, "even for a relatively brief time at this crucial juncture in his [Sammy's] development would be potentially devastating," *id.*, and "leave him vulnerable to a range of externalizing psychiatric disorders." *Id.* Mr. Kalmer is the *only* person capable of managing and containing Sammy's "wild energy in a loving way." *Id.* Both boys remain hypervilgilant, needing their father's active and routine participation in most important aspects of their day: preparing and eating their breakfast and dinner, assurance of a virtually exact time schedule as to when their father leaves for work, their daily visit to their father's office midmorning and his return at 3:00 to 4:00 pm, his participation in the evening meal and knowledge that he is close by before they will go to sleep.

In sum, their tranquility is completely dependent on a structured daily routine revolving around their father. Like Sammy, Dr. Shuman finds that Sasha is also in danger of "internalizing disorders such as anxiety and depression" if Mr. Kalmer is taken away at this critical time. *Id*. Both brothers are in desperate need of the daily and active presence, emotional support, and physical protection of their father as well as the routine which has become invaluable to their feeling of security and safety and which keeps at bay the manifestations of their separation anxiety and post traumatic stress disorders. *See* Let. Dr. Shuman at 3 ("The boys expect this daily routine and clearly express disappointment if it is disrupted in any way."). *See also Spero*, 382 F.3d at 805 (upholding finding of district court that the routine was invaluable to the child's development, supported by doctor's report and first hand observations by mother). There is simply no one else who can provide a feasible alternative to the care provided by Mr. Kalmer, making him both irreplaceable and absolutely critical to the continued emotional and physical development of his sons.

Finally as noted above, Mr. Kalmer has the additional responsibility of being the sole family caretaker of his elderly mother who resides in a residential care facility in Connecticut and whom he regularly visits. While his mother suffers from Alzheimer's and she sometimes does not know him, nevertheless sometimes she does and his visits lift her spirits and are important to maintaining her health. Mr. Kalmer consults with her health care professionals with respect to adjusting medication and feeding issues which ensures the best medical care available; he also takes care of her financial affairs. There is no family member but Mr. Kalmer who can visit his mother and perform these

functions because Mr. Kalmer's only other sibling lives in California and travels frequently.

Therefore, for the foregoing reasons this court should depart downward to a Level 10 and impose probation with the condition of home confinement.

**B. The Factors Under 18 U.S.C. § 3553 (a)(1) and (a)(2)(A) through (D) Are Satisfied by a Term of Probation with a Special Condition of Home Confinement**

As recently explained by the First Circuit, post-*United States v. Booker*, 543 U.S. 220 (2005), it is clear that even though a factor such as family circumstances is discouraged under the Guidelines, it may still be relevant in weighing statutory factors under 18 U.S.C. § 3553(a) wholly apart from the guidelines. *United States v. Aitoro*, 446 F.3d 246, 255 n.9 (1st Cir. 2006).

**1. The Requested Sentence is Reasonable**

Post-*Booker*, sentences are reviewed for "reasonableness." *United States v. Smith*, 445 F.3d 1, 3-4 (1st Cir. 2006) citing *Booker*, 543 U.S. at 765-66. The sentencing court's discretion "remains constrained by 18 U.S.C. § 3553(a)" which sets forth a number of factors in imposing sentences, including "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), the "need for the sentence imposed," *id.* at § 3553(a)(2) and the need to avoid unwarranted disparities among defendants with similar records who have been found guilty of similar conduct." *Id.* at § 3553(a)(6). *Smith*, 445 F.3d at 3-4. Section 3553 (a) (4) also requires a court to consider the sentencing range established by the Guidelines. *Smith*, 445 F.3d at 4. "… [A] district court should normally begin with the guideline calculation, and that after considering departures, the district court

should decide whether "other factors" (beyond the guidelines) warranted an ultimate sentence above or below the guideline range." *Id*. As for review for reasonableness, the First Circuit has "stressed the need for 'a plausible explanation and a defensible overall result.'" *Id*.

The requested sentence of probation with the condition of home confinement adequately reflects the "nature and circumstances of the offense" and the "history and characteristics of the defendant." *See* 18 U.S.C. § 3553(a)(1). The crime involved one count of filing a false tax return by a good and otherwise law abiding man, with an unblemished professional and personal life, replete with many years and instances of public acts of charity and private acts of *pro bono* work, as attested to by the many sincere and heartfelt letters of support. He has no criminal record whatsoever. While he did not report a portion of his income over a four year period, the taxable loss was $87,886 which he has paid, and those were years fraught with stress, pain and difficulty including dealing with the death of his father, the steady decline of his mother's mental and physical health (the only two people he has relied upon in his life) and the realization that he and his wife were unable to have children. *Id*. In considering "the history and characteristics of the defendant", it is within this court's discretion to consider the psychological needs of his adopted sons and Mr. Kalmer's irreplaceable function in sustaining those needs, as fully discussed *supra*. *Smith*, 445 F.3d at 4; *United States v. Menyweather*, 431 F.3d 692, 700 (9th Cir. 2005), amended on other grounds, 447 F.3d 625 (9th Cir. 2006) (family ties and responsibilities may form part of the broader appraisal under § 3553(a) as an aspect of defendant's history and characteristics).

The sentence reflects the seriousness of the offense, will promote respect for the law and provide just punishment for the offense. *See* § 3553 (a)(2)(A). This is so because while Mr. Kalmer will be permitted to work, he will not be allowed to leave his home in the evening and will have suffered shame and loss of reputation in the community in which he has lived these many years as a leader, likely affecting his ability to earn an income. *Id.* In addition, this is a just punishment for the offense while at the same time preserving his ability to continue to care for the psychological needs of his adopted sons and the financial needs of his family. *Id.* Incarceration would, for the reasons set forth above, be disproportionate to this crime as it would have consequences on his already severely challenged children who need his constant presence and care. *Id.*

For these same reasons, the sentence affords adequate deterrence to any criminal conduct, as Mr. Kalmer will be punished for his crimes. *Id.* at § 3553 (a)(2)(B). In addition, protection of the public from further crimes of the defendant is inapplicable where, as here, there is absolutely no indication that any further crime will be committed. *Id.* at § 3553 (a)(2)(C). Lastly, the requested sentence will allow Mr. Kalmer to receive whatever correctional treatment the Court imposes while at the same time caring for his two young sons. *Id.* at § 3553 (a)(2)(D). Mr. Kalmer has been under considerable stress and anxiety awaiting his own fate all the while continuing to take care of his children. He has suffered damage to his otherwise spotless reputation and is now a convicted felon. He is in the process of entering into a consent agreement with the Rhode Island Board of Accountancy in which he has voluntarily agreed to the suspension of his license. This will have a serious impact on his ability to support his

family. Given all that he has endured, probation with a special condition of six months home confinement serves as an adequate deterrent, if such is at all necessary, and it will provide Sammy and Sasha with the care they so desperately need, and which only Mr. Kalmer can provide. For all of the foregoing reasons it is submitted that the requested sentence is reasonable.

**C. A Fine At the Low End of the Guidelines Should be Imposed**

Pursuant to U.S.S.G. § 5E1.2 c (1) & c (2) the fine range for Level 10 is from $2,000 to $20,000. Mr. Kalmer respectfully requests that this court impose a $2,000 fine. He still faces undetermined interest and penalties on his state and federal taxes. Moreover, he is in the process of entering into a consent decree to suspend his license which will impact on his ability to earn a living.

## CONCLUSION

For the foregoing reasons, Mr. Kalmer respectfully requests that this Court depart downward from the applicable guidelines range pursuant to U.S.S.G. § 5H1.6 and alternatively, requests a sentence variance pursuant to *United States v. Booker*, 543 U.S. 220 (2005) and 18 U.S.C. § 3553(a), resulting in a departure or variance from a Level 13 (12-18 months), to a Level 10, a term of probation with a special condition of six months home confinement.

Respectfully submitted,

IRWIN KALMER

By his attorneys,

___/s/_James P. Redding____________
James P. Redding (Bar No. 2976)
GREENBERG TRAURIG, LLP
One International Place
Boston, MA 02110
Tel. 617-310-6000
Fax 617-310-6001

## CERTIFICATE OF SERVICE

I, James P. Redding, Esq. hereby state that on May 3, 2007, I have caused to be served a copy of the foregoing and attachments, by e-mail and overnight mail upon: Andrew J. Reich, Assistant U.S. Attorney, United States Courthouse, One Exchange Terrace, Providence, RI 02903 and Heather McLoughlin, U.S. Probation Officer, United States Probation Office, 2 Exchange Terrace, 3rd Floor, Providence, RI 02903.

__/s/_James P. Redding
James P. Redding

BOS 46250439v5 5/3/2007